# United States Court of Appeals
## For the First Circuit

No. 09-2148

R & B TRANSPORTATION, LLC; PAUL BEAUDRY,

Petitioners,

v.

UNITED STATES DEPARTMENT OF LABOR,
ADMINISTRATIVE REVIEW BOARD,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE ADMINISTRATIVE
REVIEW BOARD OF THE UNITED STATES DEPARTMENT OF LABOR

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

James F. Laboe, with whom Orr & Reno, P.A., was on brief for
petitioners.
Ronald J. Gottlieb, Attorney, Office of Solicitor, with whom
Deborah Greenfield, Acting Deputy Solicitor of Labor, Joseph M.
Woodward, Associate Solicitor for Occupational Safety and Health,
and Charles F. James, Counsel for Appellate Litigation, were on
brief for respondent.

August 26, 2010

**TORRUELLA**, **<u>Circuit Judge</u>**. Peter Mailloux ("Mailloux") filed an administrative complaint against R&B Transportation, LLC ("R&B"), and its owner, Paul Beaudry ("Beaudry") (collectively "Petitioners"), alleging that Mailloux was unlawfully discharged from his job as a commercial trucker for his adherence to federal safety standards.  Mailloux sought relief under the employee protection provisions of Section 405 of the Surface Transportation Assistance Act of 1982 ("the STAA"), 49 U.S.C. § 31105.[1]  A final decision and order of the U.S. Department of Labor's Administrative Review Board ("ARB") determined that Mailloux's termination violated the STAA, and awarded backpay and other expenses.  After careful review, we deny the petition.

---

[1]   The STAA prohibits employers from taking adverse employment actions against employees, including drivers of commercial motor vehicles, who engage in certain protected activities.  49 U.S.C. § 31105(j).  Specifically, the STAA provides, in relevant part:

> (a) Prohibitions.
>      (1) A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because--
>           (A)(i) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding . . .
>           (B) the employee refuses to operate a vehicle because--
>                (i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security . . . .

49 U.S.C. § 31105(a)(1)(A)(i)-(B)(i).

-2-

## I. **Facts**[2]

### A. **Mailloux's Employment**

Beaudry owns two trucking companies, R&B and Beaudry Enterprises. He also co-owns BAT Express, a third trucking company. These three entities share office space and drivers. Neither Beaudry Enterprises nor BAT Express is a party to this case.

In late-August 2004, Petitioners hired Mailloux as a driver of a commercial motor carrier, an over-the-road truck, to deliver loads on routes between New England and Florida.[3] During the scope of his employment through December 17, 2004,[4] Mailloux reported to Heather Bagley ("Bagley"), who was Beaudry's administrative assistant, that it was not possible to make various deliveries on time without violating the Federal Motor Carrier Safety Act, the Department of Transportation's ("DOT") hours of service regulation (the "driving regulation"), which restricts the number of hours drivers of commercial motor vehicles may work over

---

[2]   These facts are drawn from the factual findings of the Administrative Law Judge ("ALJ"), which the ARB affirmed.

[3]   Mailloux's exact start date is disputed and germane to the back pay issue, which Petitioners raise in this petition. See infra Part III.D.

[4]   The ALJ found that Mailloux was fired on December 17, 2004, a finding the ARB affirmed and is uncontested on appeal. Notwithstanding the ALJ's finding that Mailloux was "discharged" on December 21, 2004, and OSHA's order to Petitioners to pay Mailloux back wages from December 26, 2004, we thus adopt December 17, 2004, as Mailloux's undisputed termination date.

a certain period of time. <u>See</u> 49 C.F.R. § 395.3(b)(2).[5] Bagley informed Mailloux that the deliveries had already been scheduled and could not be changed.

On December 17, 2004, Mailloux called Beaudry's home to inform Beaudry that he was unable to make a particular delivery from Florida on time both because he had a flat tire and because he had already driven the maximum allowable number of hours under the driving regulation. During this conversation, Beaudry told Mailloux to return the truck to R&B's facility in New Hampshire and Beaudry would inquire about arranging for Mailloux to be transported back to Florida. Mailloux responded, "I guess that means I'm fired." Beaudry said only "get the truck back up here" before the conversation ended. When Mailloux later spoke with a fellow R&B driver, the driver told Mailloux "yeah, you're fired."

---

[5] 49 C.F.R. § 395.3(b)(2) provides, in full:

> (b) No motor carrier shall permit or require a driver of a property-carrying commercial motor vehicle to drive, nor shall any driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, for any period after . . .
> (2) Having been on duty 70 hours in any period of 8 consecutive days if the employing motor carrier operates commercial motor vehicles every day of the week.

### B. OSHA Investigation and Testimony Before the ALJ

On December 20, 2004,[6] Mailloux contacted the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") to report that he would soon be discharged from R&B and wanted to speak to someone. The following day, Mailloux was, according to the ALJ, "discharged."

Later, on December 27, 2004, Mailloux met with Christine Kidder ("Kidder"), an OSHA investigator, and told her that during his employment with R&B he was continually required to drive in excess of the driving regulation. During this interview, Mailloux informed Kidder that he routinely falsified his driving logs for R&B in order to provide the appearance that he was in compliance with the driving regulation.

After this initial interview with Mailloux, OSHA conducted an investigation of R&B, including an interview with Beaudry. When Kidder contacted Beaudry, he informed her that he had fired Mailloux due to his inability to properly plan his trips, which were costing the company time and money. During this interview, Kidder inquired whether R&B followed the driving regulation. Beaudry represented that he had never violated the

---

[6] The recommended decision and order of the ALJ indicates that Mailloux initially called the Occupational Safety and Health Administration ("OSHA") investigator on "December 20, 2005," and that the investigator conducted the interview with Mailloux on "December 27, 2005." However, it is clear from the record that these events occurred on their respective dates in 2004.

driving regulation. Later, during the ALJ hearing, Beaudry testified that R&B submits written notices to drivers whose driving logs are false or violate the driving regulation. Beaudry further testified that he submitted such notices to Mailloux and ultimately fired him because he was driving in excess of the maximum hours allowable by the driving regulation.

Following her interview with Beaudry, Kidder contacted the DOT's Federal Motor Carrier Safety Administration ("FMCSA") and obtained compliance reviews and enforcement reports relating to R&B ("the DOT reports"). These reviews and reports are the investigative reports prepared by "an agent"[7] who visits a company to determine whether they are in compliance with the driving regulation. Based on an audit the FMCSA conducted of R&B and on Kidder's own review of the DOT reports, Kidder learned that Beaudry and all three of the companies in which he had an interest had previously been cited for violating the driving regulation.[8] The most recent DOT report, dated April 12, 2005, showed R&B's violations of the driving regulation, as well as other DOT regulations, for the period August 23, 2004, to February 22, 2005, a time frame that included Mailloux's employment. Additionally,

---

[7] The record does not indicate what sort of "agent" conducted this investigation.

[8] The fact that these three companies share office space and drivers is, according to testimony the Division Administrator of the DOT's FMCSA provided to the ALJ, the reason their compliance with the driving regulation was jointly reviewed.

past DOT reports showed that R&B and the other two trucking companies in which Beaudry had an interest had previously been cited for violations on September 14, 2000; January 22, 2001; and June 14, 2001. Petitioners paid civil penalties associated with some of these violations.

As part of Kidder's investigation, she also interviewed Bagley, who informed her that R&B drivers routinely violated the driving regulation because they often could not otherwise complete their trips on time. Bagley stated that drivers would complain to her about driving in excess of the regulation, and the company consequently experienced high turnover. Bagley later testified to the ALJ in a deposition that when she hired drivers and they inquired about compliance with the driving regulation, she would tell them that the company complied with the regulation, even though she knew Beaudry would soon have them driving in excess of it. Bagley also testified to the ALJ that Trish Patrick, Beaudry's daughter and employee, instructed Bagley to separate toll receipts from a truck driver's time log when they did not match in order to conceal violations of the driving regulation.

Scott Hill ("Hill"), another R&B driver, testified about his experience working for Petitioners. Like Mailloux, Hill worked for R&B from August 2004 until December 2004. Hill testified that, during his employment with Petitioners, he consistently made deliveries in excess of the driving regulation. Hill stated that

he falsified his driving logs to make it appear as if he were driving within the legal limitations. Hill further testified that Beaudry met with him about his violations, and used Mapquest to illustrate how a driver could make his deliveries on time and still comply with the driving regulation. Hill also testified that Beaudry suggested that when Hill was driving in Florida he could log his driving hours as a local delivery, even though it was an interstate one. Hill additionally testified that he brought up the driving regulation issue with Beaudry. Hill stated he told Beaudry at one point that he needed "a break, I got to slow down, I want to run legal," and that Beaudry responded that he had "other drivers that will run." Hill testified that he stopped working for R&B on December 30, 2004, because he was exhausted.

## II. **Procedural History**

### A. **OSHA Findings and Petitioners' Appeal (2006)**

On January 9, 2006, OSHA issued its findings. OSHA determined that Petitioners violated the STAA by discharging Mailloux after his complaint to Petitioners regarding his work hours. OSHA ordered Petitioners to pay Mailloux back wages from December 26, 2004, through February 27, 2005, the date on which he commenced his new employment.

The same day OSHA issued its findings, Petitioners appealed OSHA's order to the ALJ. Petitioners argued that Mailloux was terminated for performing poorly, violating the driving

regulation, and failing to communicate with the company's dispatcher in a timely manner.

**B.  ALJ's Recommended Decision and Order (2007)**

Following a hearing, the ALJ issued a recommended decision and order on June 8, 2007.  The ALJ observed that the DOT reports revealed that R&B's violations of the driving regulation existed before, during, and after Mailloux's employment with the company.  The ALJ noted that the DOT reports suggested a pattern of violations associated with R&B's day-to-day operations. Additionally, the ALJ relied on these records and other evidence to find that Mailloux was terminated in violation of the STAA.  The ALJ concluded that Mailloux was entitled to relief, which included reinstatement and compensatory damages, such as back pay, pursuant to 49 U.S.C. § 31105(b)(3)(A).[9]  Because Mailloux was not seeking reinstatement, the ALJ granted him back pay from December 17, 2004,

---

[9]  49 U.S.C. § 31105(b)(3)(A), concerning "Filing complaints and procedures," provides, in full:

> (3) (A) If the Secretary of Labor decides, on the basis of a complaint, a person violated subsection (a) of this section, the Secretary of Labor shall order the person to--
>      (i) take affirmative action to abate the violation;
>      (ii) reinstate the complainant to the former position with the same pay and terms and privileges of employment; and
>      (iii) pay compensatory damages, including backpay with interest and compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

the date of his termination, to February 27, 2005, when he obtained new employment, as well as travel expenses associated with the litigation. The ALJ's order suggested that Petitioners compensate Mailloux in the amount of $9,946.80 plus interest for back pay,[10] and $314.58 for reimbursed travel expenses. Pursuant to 29 C.F.R. § 1978.109(a), the ALJ's recommendation was automatically forwarded for review to the ARB.

### C. ARB's Final Decision and Order (2009)

On June 26, 2009, the ARB issued its final decision and order. The ARB affirmed the recommendation by the ALJ and ruled that Mailloux had proven by a preponderance of the evidence that he had engaged in a protected activity (when Mailloux informed Beaudry during the December 17, 2004, telephone conversation that Mailloux could not complete the delivery then assigned to him without violating the driving regulation), that R&B was aware of the protected activity, and that R&B took an adverse employment action (the December 17, 2004, termination) against Mailloux because of it.

---

[10]  The ALJ calculated this wage rate loss using the following figures. Mailloux worked for a total of 108 days between his start date on August 25, 2004, and his end date on December 17, 2004. During that time, he earned $14,919.66, which, when divided by 108, yielded a daily wage rate of $138.15. Given that Mailloux was out of work for 72 days between his end date with R&B and the start date of his new employment on February 27, 2005, his daily wage of $138.15 multiplied by 72 days out of work yielded the $9,946.80 wage rate loss.

-10-

The ARB held that substantial evidence on the record supported the ALJ's factual findings, and that those findings were conclusive. The ARB also held that the ALJ did not abuse its discretion in admitting the DOT reports to which Kidder and a DOT representative testified, and that these reports were reliable indicators of R&B's actual violations of the driving regulation. Additionally, the ARB found that there was substantial evidence to support the ALJ's finding that R&B required its drivers to drive in excess of the driving regulation and that its drivers were not disciplined for hours of service violations. Furthermore, the ARB found substantial evidence in the record, including the fact that Beaudry did not have Mailloux's driver's log record indicating a violation of the driving regulation at the time he terminated him, to support the ALJ's finding of a causal connection between Mailloux's protected activity and his termination.

Petitioners had also argued that the ALJ erred in calculating Mailloux's daily average wage rate with R&B, asserting that Mailloux's actual start date was August 7, 2004, which, if used instead of August 25, 2004, would reduce his award for the 72-day period during which he was unemployed because it would increase the total number of days he worked and thus decrease his daily average wage rate. Nevertheless, because the ARB found that R&B did not properly raise this issue before the ALJ, the ARB declined to consider the issue on appeal and affirmed the recommended award.

## D. Petition for Judicial Review (2009)

In August 2009, R&B and Beaudry timely petitioned this court to review the ARB's final decision and order. Petitioners' petition raises three issues. They argue that (1) evidence that R&B and other trucking companies owned by Beaudry had violated DOT regulations was improperly admitted by the ALJ into evidence; (2) the ARB erroneously upheld the ALJ's decision that a causal connection existed between Mailloux's protected activity and the adverse employment action against him; and (3) the ARB erred in finding that substantial evidence existed in the record to justify the ALJ's decision regarding back pay.

## III. Discussion

## A. Standard / Scope of Review

"We review the ARB's final decision in accordance with the dictates of the Administrative Procedure Act, 5 U.S.C. § 701 et seq." Clean Harbors Envtl. Servs., Inc. v. Herman, 146 F.3d 12, 19 (1st Cir. 1998). "The ARB's decision must be affirmed unless its legal conclusions are arbitrary, capricious, or otherwise not in accordance with law, or its factual conclusions are unsupported by substantial evidence." Id.; see also 5 U.S.C. § 706(2)("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (E) unsupported by substantial evidence . . .

-12-

."). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." BSP Trans, Inc. v. United States Dep't of Labor, 160 F.3d 38, 47 (1st Cir. 1998)(quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)(citation and internal quotation marks omitted)).

### B.  The DOT Reports

#### i.  Standard / Scope of Review

Since whether the ARB properly affirmed the ALJ's decision to admit the DOT reports is an evidentiary ruling, we review it for abuse of discretion. See, e.g., United States v. Richardson, 515 F.3d 74, 84 (1st Cir. 2008); Curtin v. Office of Pers. Mgmt., 846 F.2d 1373, 1378-79 (1st Cir. 1988); see also Barker v. Admin. Review Bd., 302 Fed. Appx. 248, 249 (5th Cir. 2008)("An ALJ is granted broad discretion to make evidentiary determinations."). "An abuse of discretion occurs when a relevant factor deserving significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." United States v. DeCicco, 370 F.3d 206, 210 (1st Cir. 2004)(citation and quotation marks omitted).

### ii. Legal Framework

The Federal Rules of Evidence do not apply in APA proceedings. Instead, the rules of evidence in administrative hearings before an ALJ provide, in part, that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

29 C.F.R. § 18.404(b) (emphasis added). These rules of evidence also provide the following hearsay exception, concerning "[p]ublic records and reports": "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . [f]actual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." 29 C.F.R. § 18.803(a)(8).

### iii. Analysis

The ARB held that the ALJ did not abuse its discretion in admitting the DOT reports, considering them within the "[p]ublic records and reports" hearsay exception and "only to the extent that they reflect R&B's knowledge of its obligations pursuant to the hours of service regulations." Petitioners argue that the ALJ improperly relied on the DOT reports as highly prejudicial character evidence that showed, besides R&B's knowledge of its

-14-

legal obligations, which Petitioners claim was undisputed, that R&B was acting in conformity with its past violations of the driving regulation. Respondent counters that the DOT reports were properly admitted as "[p]ublic records and reports" and to show Beaudry's motive and knowledge in terminating Mailloux's employment.

First, Petitioners do not dispute that the DOT reports are "[f]actual findings resulting from an investigation made pursuant to authority granted by law." Petitioners do contend, however, that the DOT reports "indicate lack of trustworthiness." In making this claim, Petitioners cite to a New Jersey Superior Court case from 1988 that quotes a 1985 opinion from the Fifth Circuit stating that "OSHA citations are the opinions of investigators and ordinarily do not 'carry with [them] the indicia of reliability that is inherent in government adopted safety standards.'" Millison v. E.I. du Pont de Nemours & Co., 545 A.2d 213, 224 (N.J. Super. Ct. App. Div. 1988)(alteration in original) (quoting Dixon v. Int'l Harvester Co., 754 F.2d 573, 581 n.5 (5th Cir. 1985)). In any event, as the ARB observed, R&B paid the penalties imposed by the DOT as a result of the admitted reports, the terms of which explicitly stated that such payments "constitute admission of the violation(s)." These admissions bolstered the

-15-

trustworthiness of the DOT reports, supporting the ALJ's consideration of the reports as being within its discretion.[11]

Second, Beaudry's knowledge in discharging Mailloux is, as discussed in Part III.C., relevant to the instant case. The DOT reports suggested that Beaudry knew or should have known of the driving regulation and R&B's failure to comply with it in the past. The DOT reports indicated that Beaudry knew or should have known he was not telling the truth when he told Kidder that he had never violated the driving regulation, which undermined his credibility when testifying. The Ninth Circuit has observed that, "[w]hen offered to prove knowledge, . . . the prior act need not be similar to the charged act as long as the prior act was one which would tend to make the existence of the defendant's knowledge more probable than it would be without the evidence." United States v. Ramirez-Jiminez, 967 F.2d 1321, 1326 (9th Cir. 1992). Here, the prior acts of Petitioners were their violations of the driving regulation. These acts would certainly be relevant as tending to show that Petitioners were aware of their obligations under the driving regulation, that their employees were supposed to comply

---

[11] Petitioners argue that their payment of the DOT penalties should not be taken as an admission of the underlying violations because, Petitioners claim, they paid the penalties merely "in an effort to avoid litigation and to resolve the outstanding disputes." This argument is unavailing because Petitioners' reason for paying the penalties is irrelevant to their constructive admission.

with it, and that Petitioners had repeatedly violated that regulation in the past.

We thus hold that it was not an abuse of the ALJ's broad discretion to admit the DOT reports not as character evidence but both pursuant to the "[p]ublic records and reports" hearsay exception and as proof of Petitioners' knowledge concerning their history of complying with the driving regulation. However, even if the ALJ abused its discretion here, any purported error was harmless in light of the other evidence against Petitioners, which was substantial, as discussed in the next Part. See Mekhoukh v. Ashcroft, 358 F.3d 118, 130 (1st Cir. 2004) (reviewing an evidentiary ruling in the administrative law context for harmlessness).

### C. The STAA Claim

#### i. Legal Framework

"A prima facie case of unlawful termination under the STAA requires a showing that the employee engaged in protected activity, that the employee was subjected to adverse employment action, and that there was a causal connection between the protected activity and the adverse action." Clean Harbors Envtl. Servs., Inc., 146 F.3d at 21. "If a complainant makes out a prima facie case, the employer may rebut that showing with evidence of a legitimate, non-retaliatory reason for the adverse employment action. The burden then shifts back to the complainant to prove

that the proffered reason is actually a pretext for unlawful retaliation." BSP Trans, Inc., 160 F.3d at 46; see also Day v. Staples, Inc., 555 F.3d 42, 53 (1st Cir. 2009).

### ii. Analysis

Mailloux engaged in protected activity when he informed Beaudry on December 17, 2004, that he refused to exceed the driving regulation to make a particular delivery on time. Because Mailloux was speaking to Beaudry, Petitioners knew of Mailloux's protected activity. Mailloux was then subjected to an adverse employment action when Beaudry terminated him during the same conversation. These three ALJ findings are undisputed. We thus consider whether substantial evidence supports the ARB's affirmance of the ALJ's conclusions that there was a causal connection between Mailloux's protected activity and the adverse action against him, and that Petitioners' proffered reason for the adverse action was actually a pretext for unlawful retaliation. We find that such substantial evidence exists.

Petitioners argue that Mailloux failed to prove a causal connection between his protected activity and termination. In so doing, they assert that substantial evidence in the record, including Beaudry's testimony, supports a determination that there was a legitimate, non-retaliatory reason for discharging Mailloux, and that the ARB erred in upholding the ALJ's contrary decision.

-18-

Petitioners submit that R&B diligently processes its drivers' paperwork and relies heavily upon them to provide accurate and timely information regarding their hours of duty. Petitioners also contend that Mailloux, of his own accord and without informing R&B, falsified his data logs due to his bleak financial situation, because if he had followed the driving regulation, Mailloux would have earned less money. Petitioners claim that R&B later uncovered these violations and informed Mailloux of them in order to compel him to conform to R&B's policy of requiring its drivers to comply with the driving regulation. Thus, Petitioners claim that, rather than as a result of his protected activity, Mailloux was terminated for a legitimate business purpose: because he refused to conform his conduct to the company's standards of properly logging driving time and keeping within the requirements of the driving regulation.

However, the ALJ specifically disbelieved Beaudry's testimony. First, the ALJ found that Beaudry's testimony that R&B required its drivers to comply with the driving regulation was undermined by the DOT reports. Second, the ALJ concluded that Beaudry was "lying" when he told Kidder that he had never received any previous citations from the DOT for hours of service violations.[12] As the finder of fact and a witness to Beaudry's

_____

[12] Although Kidder clarified on cross examination that Beaudry had actually said that he never violated the regulations -- not that he received no citations -- the ALJ's logic and conclusion here are still valid: because Beaudry's payment of the fines constituted an admission of the underlying violations, the testimony by Kidder on

-19-

testimony, the ALJ's "credibility determinations are entitled to great deference." See P. Gioioso & Sons, Inc. v. OSHRC, 115 F.3d 100, 108 (1st Cir. 1997). We have previously observed in another case involving alleged retaliation when an employee engaged in protected activity that a fact finder can find pretext for unlawful termination where "the employer's proffered explanation is unworthy of credence." See McDonough v. City of Quincy, 452 F.3d 8, 18 (1st Cir. 2006) (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 143 (2000))(internal quotation marks omitted). The ALJ could thus find that Beaudry's testimony about Mailloux's on-the-job conduct was pretext for Mailloux's unlawful termination because the ALJ had found Beaudry's proffered explanation to be unworthy of credence.

Other evidence in the record further supports the ALJ's finding that Mailloux's termination was on account of his protected activity and not his non-compliance with the driving regulation. Bagley testified that Petitioners were aware that their drivers exceeded the hours allotted by the driving regulation, and, further, that they expected their drivers to do so. Hill testified that Petitioners regularly pressured their drivers to violate the driving regulation. Thus, based on the testimonies of Mailloux, Beaudry, Bagley, and Hill, and the DOT reports, we find that

which the ALJ based the finding that Beaudry was lying did in fact support this finding.

substantial evidence supports the findings that a causal connection existed between Mailloux's protected activity and the adverse employment action against him, and that Petitioners' proffered reason for terminating Mailloux was actually a pretext for unlawful retaliation.

### D. The Back Pay Award

The ALJ noted in its recommended decision and order that Petitioners "have not challenged August 25, 2004 as [Mailloux's] initial start date." Moreover, the ALJ found that Mailloux began work on August 25, 2004, based in part on an absence of any objection from Petitioners.

The ARB found that, as the ALJ noted, R&B did not raise before the ALJ any issue regarding or dispute concerning the calculation of Mailloux's back pay award. Consequently, based on its precedent declining "to consider issues or arguments raised for the first time on appeal," the ARB declined to consider the matter, finding both that R&B had waived this argument on appeal and that substantial evidence supported the ALJ's recommended back pay award. As a result, the ARB affirmed the ALJ's recommended back pay award.

Petitioners argue on appeal that the ALJ erred in determining that the start date of Mailloux's employment was August 25, 2004. Petitioners contend that their post-hearing brief, which the ALJ ordered on July 28, 2006, and which

Petitioners filed on October 30, 2006, specifically addressed the issue of damages, and established Mailloux's start date as August 7, 2004.

Petitioners did explicitly raise this matter in its post-hearing brief. Under the "Statement of All Issues" in that brief, Petitioners claimed that Mailloux's employment with R&B spanned 133 days, which Petitioners reiterated in the "Statement of Facts" section of that brief and noted was based on an initial start date of August 7, 2004. However, despite the ALJ's instructions in its briefing order and warning about waiver,[13] this statement was unaccompanied by any argumentation in this brief and is also not addressed in any way in Petitioners' December 8, 2006, response to the post-hearing reply brief. Only on appeal do Petitioners proffer an argument for their proposed alternate start date: Mailloux signed a receipt for his copy of the Federal Motor Carrier Safety Regulations Pocket Book on that date, indicating he commenced employment then. As Petitioners, despite the ALJ's instructions and warning, did not specifically address in their post-hearing brief arguments concerning the back pay award, the ARB's legal ruling that they waived the matter was not "arbitrary,

---

[13] In its July 28, 2006 briefing order, the ALJ stated that each brief shall include an argument "addressing each issue in a separately numbered section." Furthermore, the ALJ noted that "issues or arguments not specifically addressed in the brief will be deemed to have been waived."

capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).

## IV. Conclusion

For the reasons stated above, we deny review.